CLARK, Retired Circuit Judge.
A jury found defendant-appellant guilty as charged in an indictment of receiving stolen property that alleged in pertinent part that he:
“did intentionally receive, retain, or dispose of stolen property, to-wit: one (1) Johnson boat motor, a better description of which is otherwise unknown to the Grand Jury, the property of Richard P. Deaton, of the value of $1,071.00, knowing that it was stolen or having reasonable grounds to believe it had been stolen and not having the intent to restore it to its owner, in violation of § 13A-8-17 of the Code of Alabama.”
At a duly conducted sentencing hearing, the trial court sentenced defendant-appellant to imprisonment for three years.
We do not need to consider all the issues submitted by appellant, for we think that one issue alone is dispositive of this appeal, for the reasons shown by the remainder of this opinion.
Counsel for appellant argues in his brief that there was error by the trial court in *917 denying defendant’s motion for judgment of acquittal “which was made on the grounds that the charge embraced in the indictment was barred by the statute of limitations that provides that the prosecution of all felonies, except those specified in Sections 15-3-3 and 15-3-5 of the Code of Alabama [not involved here] must be commenced within three years after the commission of the offense as provided by Section 15-3-1 of the Code of Alabama 1975.”
Counsel for appellant further states in his brief the following:
“In the case at bar the prosecution stated in response to the motion for judgment of acquittal made at the closing of State’s evidence, that the crime of buying and receiving stolen property, for which the Appellant was convicted, was [a] continuing offense and not one that would be barred by the statute of limitations. This writer [appellant’s attorney] has been unable to ascertain an Alabama case on point which touches on whether this offense would be considered one of a continuing nature or not. All offenses of a continuing nature require some overt act or continuing duty on the part of the defendant and require no intent to commit the offense.”
Counsel for appellant further argues in his brief as follows:
“It is apparent to this writer that there is no case on point concerning the issue of whether the specific crime is a continuing offense in Alabama. It would follow that if buying and receiving and retaining stolen property was a continuing offense there would be some authority to substantiate the same. There is no authority to support the prosecution's contention that said crime is a continuing offense, therefore, said statute of limitations should be construed in favor of the defendant. Obviously the prosecution will be barred by the statute of limitations if the crime of which the Appellant was convicted is not a continuing offense.”
The first witness who testified at the trial of the case was the owner of the “Johnson boat motor,” designated in the indictment as Richard Phillip Deaton of Stone Mountain, Georgia, who testified that he became acquainted with defendant-appellant, who was living at that time at Lawrenceville, Georgia. We quote part of Mr. Deaton’s testimony, as follows:
“Q. Do you know what his [defendant’s] profession or occupation was at that time?
“A. Attorney.
“Q. You said you first became acquainted with him at Lake Lanier?
“A. Yes, sir.
“Q. Where is Lake Lanier?
“A. Northeast of Atlanta, about 40 miles.
“Q. What is Lake Lanier?
“A. A recreation lake.
“Q. It is a reservoir for hydroelectric power?
“A. Yes, sir.
[[Image here]]
“Q. You said you became acquainted with the defendant at that place?
“A. Yes.
“Q. What did the defendant do at Lake Lanier?
“A. He had a houseboat next to mine. I was in Dock Slip 13 and he was in Dock Slip 14.
“Q. These slips you have described, were they rented or leased by you and the defendant from somebody?
“A. They were leased from Holiday Marina.
“Q. Except for the time your boats were actually out maneuvering the lake, they were in that slip?
“A. Yes.
“Q. Would you describe your houseboat?
“A. It was a fifty-foot Stardust Houseboat, with a bathroom and one bedroom, living room and kitchen area.
“Q. Did you stay on that boat overnight?
*918 “A. Yes, I lived there for three and a half years.
“Q. You lived there?
“A. Yes.
[[Image here]]
“Q. You were in Slip 13 and you say the defendant had a houseboat on Slip 14?
“A. Correct.
“Q. What size houseboat did he have?
“A. I believe his was a thirty-six foot.
“Q. Did he stay there at times?
“A. He came almost every weekend.
“Q. At this time, did you own or acquire an outboard motor?
“A. Yes.
“A. What kind of outboard motor?
“A. Johnson twenty-five horsepower.
“Q. Did you acquire the boat at the same time?
“A. Yes, sir.
[[Image here]]
“Q. What kind of boat was it?
“A. A Sears Rigid, inflatable, grey in color, with a wood deck of dark mahogany.
“Q. Inflatable?
“A. Yes.
“Q. Did the boat and motor have serial numbers?
“A. Yes, sir.
“Q. Did you get a bill of sale from whoever you bought this motor from?
“A. Yes, sir.
“Q. Does it contain a serial number?
“A. Yes.
“Q. Do you have that bill of sale with you?
“A. Yes.
“Q. Did something happen to that boat and motor?
“A. Yes, on April 8, 1980 — either the 19th or the 20th — the boat and motor were stolen.
“Q. 1980?
“A. Yes, sir.
“Q. At that time, did the defendant still have his boat there in Slip 14 and you had yours in Slip 13?
“A. Yes.
“Q. Where was this boat and motor the last time you saw it?
“A. The boat was packaged and stored on top of my houseboat. The motor and battery and some accessories were inside my houseboat,
“Q. Did you report this incident to the local authorities?
“A. Yes, sir, I reported it to the Hall County Sheriffs Department and they subsequently did an investigation.
“Q. At this particular time did you say the spring of 1980?
“A. April, 1980.
“Q. At this time, what was your relationship with the defendant?
“A. I didn’t know Joe very well. He was acquainted with a girl I was dating. I had met Joe on weekends and seen him on his boat. I didn’t know him personally real well.
“Q. Prior to the time this boat and motor came up missing, how long had you owned it?
“A. Approximately one year.
“Q. During that year, had the defendant been on or near or around that boat and motor?
“A. Yes, sir.
“Q. Had you ever had any conversations with him?
“A. Yes, sir.
“Q. At that time?
“A. The boat was stolen on Friday or Saturday. The previous Thursday before that, Joe had been there with two other people. I was in the boat, and we had a conversation about the boat — what it was, how fast it would go — what size motor it was. He had seen it.
“Q. Had the boat and motor been exposed to anybody that could see it?
“A. I kept it tied up on my houseboat for two weeks. I kept it inflated. On that *919 Thursday, the day I had the discussion with him, I deflated the boat and stored it.
“Q. What was the value of that motor?
“A. $1,071.20.
“Q. Is that your judgment as to the correct value of it?
“A. That is what I paid for it.
“Q. The question was: Is that the value of it?
“A. Yes, sir.
“Q. At the time this boat and motor came up missing, did you see the defendant?
“A. Yes. The Sunday I came up and discovered that the boat had been stolen, I was extremely upset about it. I didn’t know what to do. I hadn’t been on the lake very long. The first person I talked to about it was Joe Wilkerson. He was an attorney and had been on the lake two or three years. I asked him if he had any idea who might have stolen it, or knew anybody that had that type reputation. I asked him who the people were that were with him on the previous Thursday and if there was a possibility they had been involved in it. I asked him who I should notify and what should I do.
“Q. You discussed it with him?
“A. At length.
“Q. Do you recall his reply or response to your questions?
“A. It was very negative. He had no suggestions. As far as to the two people with him on the previous Thursday, he said he didn’t feel they would be involved at all and wouldn’t tell me who they were.
“Q. How long did the defendant remain living there or having his boat there at this slip?
“A. He still had the boat on Lake Lanier when I left there and sold my houseboat two and a half years later.
“Q. You sold your boat when—
“A. I sold it December 1982.
“Q. Did you see the defendant after 1982?
“A. Yes, on many occasions. I still have another boat that I purchased — a Sea Ray 19 foot. I visit the lake on weekends. I had a business cleaning boat docks and doing diving work. I would see him socially also.
“Q. Sometime after 1982, did the defendant remove from the State of Georgia?
“A. To my knowledge, he is still a resident of Georgia.
“Q. Did he come to this area to live?
“A. Yes, he came here with another friend of mine, Bob Johnston. We purchased a marina at Costa Mesa Marina.
“Q. Is that south of Pell City on Logan Martin Lake?
“A. Yes.
“Q. Sometime last year, did you have occasion to go over there to the Marina—
“MR. LOWERY: Object to leading.
“Q. THE COURT: Overruled.
“Q. Did you have an occasion last year to go to that marina?
“A. Yes.
“Q. When was this?
“A. 28th of June, 1985.
“Q. A year ago?
“A. Yes.
“Q. From the time this boat and motor was stolen, did you make an effort to find it?
“A. Yes.
“Q. During the course of your search, did you become acquainted with the serial number of that outboard motor?
“A. Yes, sir.
[[Image here]]
“Q. Back on the 28th of June, of last year, went to the marina where the defendant was?
“A. Yes, sir.
“Q. Was he present?
“A. No, sir.
“Q. Did he later come up?
“A. Yes.
*920 “Q. Did you see him there on that occasion?
“A. I saw him late that evening about ten o'clock.
“Q. What was the occasion for your going to the marina?
“A. Mr. Johnston and Mr. Wilkerson were partners at the Marina. Mr. Johnston and I, at a previous time had a small business on Lake Lanier doing diving and cleaning boat bottoms. We designed hydraulic self-water brushes to clean material from the bottom of boats. I wanted to get out of that business. I offered to sell it to Mr. Johnston. He agreed to buy it. I brought the stuff from Atlanta.
“Q. You brought the gear to Mr. Johnston?
“A. The hydraulic equipment.
“Q. While you were at the marina, did something attract your attention?
“A. Yes, I saw a boat and motor sitting on a trailer exactly like mine.
[[Image here]]
“Q. You described your boat and motor —will you describe your boat and motor you saw under the shed there at the marina?
“A. It was a grey, rigid inflatable, with a dark mahogany floor, with a 25 horsepower Johnson sitting on the back.
“Q. Did you examine the serial number of this?
“A. The serial ... number, I recognized as soon as I looked at it. I looked at the serial number on the boat and it had been removed. The manufacturer’s I.D. had been removed.
[[Image here]]
“Q. You said you saw this motor at the Marina in St. Clair County?
“A. Yes, sir.
“Q. Do you recall when that was?
“MR. LOWERY: Judge, I object to that. That is repetitious.
“THE COURT: That is repetitious. He said June 28, 1985.
“Q. When you examined the outboard motor on this boat that you described, did that serial number correspond with the serial number you have on the bill of sale?
“A. Yes, sir.
[[Image here]]
“Q. Prior to coming from Atlanta with this gear, did you have any conversation or did you make Mr. Wilkerson aware that you were coming to Alabama?
“A. No, sir.
“Q. To your knowledge, he had no forewarning of your coming?
“A. To my knowledge, he did not.
“Q. Based on what you learned on this occasion, in June of 1985, is that when you swore out the complaint against Mr. Wilkerson?
“A. Yes.”
We now quote a part of Mr. Deaton’s testimony on cross-examination:
“Q. When did you take a trip to Florida with Mr. Wilkerson?
“A. I have never been to Florida with Mr. Wilkerson.
“Q. You met him by virtue of his houseboat being parked next to yours?
“A. Yes, sir.
“Q. Is it not a fact that at that time, when you met Mr. Wilkerson, you met this business partner of yours, Bobby Johnston?
“A. No, sir.
“Q. When did you meet Mr. Bobby Johnston?
“A. I met Bobby Johnston approximately one year or one and a half years later.
“Q. How did you come about meeting Bobby Johnston?
“A. Bob Johnston moved his houseboat on the same dock I was on.
“Q. He was acquainted with Mr. Wilkerson at that time?
“A. Yes.
“Q. Do you recall making that trip to Destín, Florida, with—
*921 “A. I have never been to Destín, Florida, with Mr. Wilkerson or with Mr. Johnston.
“Q. I didn’t ask you about Mr. Johnston. Have you ever been out of the State of Georgia with Mr. Wilkerson?
“A. I have never been any place with Mr. Wilkerson personally at any time ever. I haven’t been out of the State with him and have not been on one trip with him.
[[Image here]]
“Q. Did you talk to Mr. Wilkerson that night that you supposedly found this boat down there and have a few drinks with him?
“A. Yes, I did.
“Q. Did you mention to him, ‘Hey, Joe, there is my boat and motor?
“A. No, I did not.
“Q. Did you mention it to anyone at the Marina, ‘Hey, man, there is my boat and motor that somebody stole six years ago’? Did you mention that?
“A. I’d already charged Mr. Wilkerson—
“Q. Did you mention that?
“A. No, sir, I did not mention it to anyone.
[[Image here]]
“Q. How long had you known Bobby Johnston?
“A. Three years.
“Q. In June of 1985, was he an owner of this marina at that time? He’s the one you were going to see was he not?
“A. Yes.
“Q. You said you were in a business relation with him. Were y’all partners in that?
“A. No, sir.
“Q. Was he. involved in it with you?
“A. Yes, sir.
“Q. How was he involved in it with you?
“A. It is rather complicated. We had the money divided up that we earned. I believe the agreement we had is basically, he would receive—
I invested all the money and built the equipment for seven or eight thousand dollars. As we would do the work, he would received twenty to thirty percent of the income. Twenty would be re-invested toward repaying me.
“Q. Were you and Bobby Johnston friends?
“A. Yes, sir.
“Q. On June the 28th?
“A. Yes, sir.
“Q. You went to a place that Bobby Johnston was at? Is that correct?
“A. Yes, sir.
“Q. You went for the sole purpose of seeing Bobby Johnston?
“A. Yes, sir.
“Q. To sell your interest in a business that you and he were connected with?
“A. Yes, sir.
“Q. You went there, put your machine in the slip, you saw a boat or motor-let’s talk about the boat just a minute. Was that motor on a boat? The motor and boat you saw — how did you testify — did you testify you saw a boat?
“A. Yes.
“Q. What kind of boat did you see?
“A. A gray, rigid inflatable boat with dark mahogany—
“Q. Don’t look at the pictures.
“A. There is a picture if you want to see it.
[[Image here]]
“Q. After you saw the boat, did you go back to Georgia right then?
“A. Yes, sir.
“Q. You didn’t stick around for any time down there?
“A. I stayed about thirty minutes.
“Q. What time of the day was this?
“A. To the best of my knowledge, it was about three o’clock or two o’clock.
“Q. Did you come back to the marina that night?
*922 “A. Yes, I did.
“Q. Why did you come back?
“A. When I went back and discussed what I had found with my wife, I found it very difficult to believe that Bobby Johnston was a part of a theft of my boat or possession of my boat. I returned to the marina and then charged Mr. Wilkerson with possession. I went back to the marina and told Bobby Johnston that it was my boat and my motor — or my motor at least. I told him I was not sure it was my boat or not. I discussed it with Bob Johnston and his wife.
[[Image here]]
“A. I have not read any legal document that places him [Mr. Wilkerson] in ownership of that marina.
“Q. You don’t know if it is incorporated or what it is, do you?
“A. No, sir, I do not.
“Q. Do you claim to have had the only twenty-five horsepower motor that was manufactured that year?
“A. I had the only twenty-five horsepower Johnson with that serial number on it.
“Q. When you spotted this boat and motor at this marina, were you expecting to see it?
“A. Was I expecting to see that boat and motor?
“Q. Yes.
“A. No, sir.
“Q. Total shock, wasn’t it?
“A. Yes, sir.
[[Image here]]
“Q. As far as your personal knowledge goes of the whereabouts of that boat, you have no idea how it got there and under whose control it was do you?
“A. I don’t understand the ‘whereabouts’. You lose me there.
“Q. I’m not talking about what you were told. Do you have any personal knowledge of how that boat got there or....
“THE COURT: All right, let him answer that one.
“A. I do not know how the boat got there.
“THE COURT: All right, now you can ask the next question.
“Q. Do you have any personal knowledge under whose control that boat and motor was when you saw it?
“A. The boat was sitting in the marina.
“THE COURT: The question was do you have any personal knowledge under whose control the boat was under. Answer yes or no.
“A. No.
“Q. Do you have any personal knowledge that this man possessed that boat knowing that boat and motor were stolen?
“A. Absolutely he knew it was stolen. Beyond a shadow of a doubt, he knew it was my boat.
“Q. What knowledge do you have of that?
“A. I discussed it with him. He had seen the boat previously sitting in that marina. His name is right there on the boat and trailer.
“Q. Didn’t you testify it was not your boat?
“A. The boat was extremely similar. You are confusing me when you say boat. We are here discussing a motor. I’m trying to stick with the motor. You are the one that keeps bringing up the boat. The boat was sitting in the marina with his name on it.
“A. Is he charged with stealing the motor or possession of the motor?
“MR. FAMBROUGH: Judge, that is a legal question.
“THE COURT: Sustained.
“Q. Tell me, it was a Johnson motor, wasn’t it? Mr. Johnston — I mean Mr. Dea-ton. I don’t know why I keep thinking that.
“A. Bob Johnston was involved on the business.
*923 “Q. Did you discuss this with Joe Wilkerson?
“A. Since when?
“Q. Since you had him arrested?
“A. No, sir.
“Q. Did you ever go to him and say: ‘Look, there’s a motor down there and I’m going to blame you for it’?
You never said that, did you?
“A. No, sir.
“Q. Did you ever go to him and say, ‘Hey, did you know that was my motor that I lost six years ago’?
“A. No.
“Q. Y’all had been friends?
“A. Yes.
“Q. You just came up here without any discussion, took a warrant out for him, didn’t you?
“A. Yes, sir.
“Q. When, indeed, you don’t know under whose control it was under?
“A. You are wrong about that. I dispute that.
“Q. What personal knowledge do you have to substantiate that?
“A. I have the word of a friend.
“Q. I’m not asking about the word of anybody.
“MR. FAMBROUGH: He asked him a question [and] he is trying to answer it.
“THE COURT: He has answered it two or three times; but go ahead and answer it from your own personal observation and knowledge — not what you heard or what somebody else told you.
“A. From my own personal observation, when I saw the boat, it looked exactly like mine and it had his name on the bottom of the trailer.
“THE COURT: That is not answering the question.
“MR. FAMBROUGH: Your Honor, he observed a boat on a trailer that had this defendant’s name on the trailer. I don’t see why that is not admissible.
“THE COURT: The question was did he have personal knowledge who was in possession of it.
That is what he is asking.
“MR. FAMBROUGH: The question was personal knowledge or observation.
“MR. LOWERY: No, sir, it is not.
“THE COURT: He can answer that. Just listen to the question and answer it. What personal knowledge do you have?
“A. None.
“Q. That’s all. That is what he is asking.
“MR. FAMBROUGH: The question was personal knowledge or observation.
“MR. LOWERY [Defendant’s attorney]: No, sir, it is not.
“THE COURT: He can answer that. Just listen to the question and answer it. What personal knowledge do you have?
“A. None.
“Q. That’s all.”
We now quote almost the entire remainder of the lengthy testimony of Mr. Deaton, particularly while testifying on redirect examination by the State:
“Q. Did you have that conversation with Mr. Johnston when Mr. Wilkerson was present prior to the time you took out a warrant against Mr. Wilkerson?
“A. You lost me.
“Q. When did you have this conversation with Mr. Wilkerson present with Mr. Johnston?
“A. About ten o’clock at night.
“Q. Where did you have the conversation?
“A. They have a small restaurant there at the marina.
[[Image here]]
“Q. Did you and Mr. Wilkerson have a conversation too that night?
“A. Yes, sir.
“Q. Was this the night of the 28th of June?
“A. I believe it was June 27th.
*924 “Q. Was this prior to the time you discovered your motor?
“A. It was after.
“Q. You had a conversation with him at a restaurant?
[[Image here]]
“Q. At that time and place, when you had a conversation with Mr. Johnston and Mr. Wilkerson, with Mr. Wilkerson present, what was said at that time and place?
“THE COURT: Sustained.
“Q. In that conversation with either Mr. Wilkerson or with Mr. Johnston, with Wilkerson present, was there any discussion about this boat and motor?
“A. No, sir.
“Q. Was there any discussion about the marina?
“MR. LOWERY: I object to that, Judge.
“THE COURT: Sustained.
“MR. FAMBROUGH: Your Honor, he has tried to go into his knowledge of who had the marina.
“THE COURT: The burden is on the State to prove this.
“MR. FAMBROUGH: That is what I’m trying to overcome.
“THE COURT: Sustained.
“MR. FAMBROUGH: That’s all I have for this witness.
“MR. LOWERY: Nothing further.”
The only other witness on the trial of the case was Officer Richard Smith, an investigator with the St. Clair County Sheriff's office, from whose testimony we quote as follows:
“Q. Specifically on or about the 28th or 29th of June, did you have an occasion to go somewhere on Logan Martin Lake in St. Clair County?
“A. Yes, sir.
“Q. What was the purpose of your going to that area? Where did you go?
“A. Coosa Island Marina.
“Q. What was the purpose of your going there?
“A. I went with Mr. Richard Deaton concerning a boat and motor that he stated belonged to him and was at the marina there. He wanted me to go with them to retrieve it.
[[Image here]]
“Q. Were your furnished a serial number of the motor before you went down there?
“A. Yes, sir.
“Q. When you examined that outboard motor, did the serial number that was furnished you correspond with the number on this motor?
“A. Yes.
“Q. Did you make a memorandum of the number that you took off the motor itself?
“A. Yes, sir.
“Q. What was that number?
“A. 5059200.
“Q. Mr. Smith, did you observe where that motor was situated?
“A. Yes, sir.
“Q. Where was it?
“A. Attached to a boat — a rubber raft type boat which was on a trailer.
[[Image here]]
“Q. Where did you go? What marina did you go to on that occasion?
“A. Coosa Island Marina.
“Q. Are you aware who the proprietor or proprietors were at that time?
“A. One of them was the defendant and another was a Mr. Johnston.
“Q. Mr. Wilkerson and Mr. Johnston were proprietors at that time?
“A. Yes, sir.
[[Image here]]
“Q. On the second trip that you made on June 28th, did you have a warrant of arrest for Mr. Wilkerson?
“A. Yes.
“Q. At that time, I believe you testified earlier that you had not seen the defendant?
“A. I didn’t on the first occasion.
*925 “Q. Did you see him on the second occasion?
“A. Yes, sir.
“Q. Where did you see him?
“A. At the Coosa Island Marina.
[[Image here]]
“Q. What did you tell Mr. Wilkerson at that time and place?
“A. At that time, I told Mr. Wilkerson that I had a warrant for his arrest for receiving stolen property, which was a 25 horsepower Johnson motor.
“Q. At that time, and when you made that statement to Mr. Wilkerson, did he say anything to you or in your presence?
“A. Yes, sir.
[[Image here]]
“A. That was at the Coosa Island Marina.
“Q. After that, did you transport him to the jail or sheriffs office?
“A. Sheriff’s office.
“Q. At that time and place, after you transported him there, did you then advise him of his rights in any way?
“A. Yes, sir.
“Q. How did you do that?
“A. At that time, I handed him a form with the Miranda warning on it and asked him to read it and sign it, which he did.
“Q. You testified earlier you were aware he was an attorney?
“A. Yes, sir.
[[Image here]]
“Q. To your knowledge, did the defendant read or observe this form he subsequently signed?
“A. Yes, sir.
“Q. After he read it, did he ask you any questions?
“A. No, sir. He just signed it.
[[Image here]]
“Q. After he executed or signed this paper, did you ask him any questions?
“A. Yes, sir.
“Q. What did you ask him?
“A. I asked him where he got the boat motor. He told me he had bought the motor. I asked him if he remembered who he bought it from and he stated he did not. I asked him if he had a bill of sale for the motor and he said he did not. That is basically all I asked him.
[[Image here]]
“Q. Was it ever reduced to writing?
“A. No, sir.
“Q. That is what the defendant told you?
“A. Yes, sir.
“Q. He was under no threat and no one induced him to make this statement?
“A. No, sir.
[[Image here]]
“Q. Would you tell me one more time what he did state to you at the Sheriff’s office?
“A. I asked him how he came about the motor. He told me he had bought the motor. I asked him did he know who he bought it from. He said he didn’t remember. I asked him if he had a bill of sale for the motor and he said he did not.”
We now quote the conclusion of the evidence presented in the case, which was from the testimony of Officer Richard Smith while he was being cross-examined by defendant’s attorney. We quote therefrom all of the testimony during said cross-examination:
“Q. Did you ascertain at the time of this arrest, where Mr. Wilkerson was living?
“A. Yes.
“Q. Where?
“A. On a house boat at Coosa Island Marina.
“Q. Not in Atlanta, Georgia?
“A. That is not what Mr. Johnston informed me.
“Q. Did you ask Mr. Wilkerson?
“A. No.
*926 “Q. You don’t know where he was living?
“A. At the time I arrested him, no. After I arrested him, yes.
“Q. That’s all.”
We have stated hereinabove all of the evidence in the case that pertains to any question raised by appellant in regard to whether the evidence supported the verdict and judgment in the trial court:
We now quote from the transcript some of the material argument made by counsel for the parties in the trial court:
“MR. LOWERY [Defendant’s counsel]: At this point, the defendant would move for a judgment of acquittal and for grounds states as follows: Number one, I feel the State has failed to meet the burden of proof to sustain any type of conviction under the indictment as charged, inasmuch as there has not been any evidence offered whatsoever that would prove this man has knowledge of a boat that was stolen or should have even had knowledge that the boat was stolen. Obviously, there was a theft of a boat and obviously, it took place in 1980. There has been no testimony as I can see that the defendant bought, received, concealed or aided in concealing this boat or motor, knowing it was stolen or that he should have known it was stolen.
[[Image here]]
“MR. FAMBROUGH [State’s counsel]: That is a matter that addresses itself to the Jury whether or not there was insufficient evidence to show these points he has brought up. The Court heard the testimony from the witnesses that would put the defendant in the position to have actual knowledge of it.
“MR. LOWERY: As to the motor, the gentleman testified it cost $1,071 or $1,079. He said it was worth $500 now or was in June of 1985. I don’t think it could be inferred in any way there should have been constructive notice because it just has not been there. There is nothing for the Jury to consider.
“THE COURT: As to that phase of your argument, the motion is overruled.
“MR. LOWERY: Now, we get to the statute of limitations. Testimony was that this motor was taken in 1980. This particular crime carries a three year statute of limitations on it. Testimony has been that the warrant was taken in June of 1985. This offense took place in Georgia where it was stolen. The boat found its way to Alabama. The burden is on the State of Alabama, once the motion was filed, to show when this crime actually took place. This crime actually took place once it’s complete. Once the motion was filed contesting the statute of limitations on this matter, I think the State must prove the crime in the indictment itself was framed and largely within the period described by the Code of the State of Alabama. They have failed to mention any time period, other than when the boat was taken. Short of that, anything prior to three years from when the boat was taken, they would have to have brought this within five years of 1983. That is the whole purpose of the statute of limitations — to do away with prolonging prosecution and any prejudice that might be caused by any situation such as this, someone coming in saying that they found something. Five years later, there is no way a man could possibly defend himself. This is the exact situation that is supposed to be safeguarded by that particular section of the Code.
“MR. FAMBROUGH: The wording of the indictment states the defendant is charged with receiving, retaining or disposing — those ... are words which strongly imply this is a continuing offense and not one that will be barred by the statute of limitations from the outset of the theft. We met all the burden of proof that is necessary in a receiving stolen property case.
“THE COURT: Any further argument?
“MR. LOWERY: Yes, Judge, number one, they have failed to show it was in his possession or control at Coosa Island Marina; and number two, this is not a continuing offense. The crime of this offense is completed once the three elements are met.
[[Image here]]
*927 “THE COURT: Your motion is overruled.
“MR. LOWERY: Judge, there has been testimony that this motor was worth $500 in June of 1985. That would make it second degree.
“THE COURT: Your have had testimony of over $1,000 and you have $500.
“MR. LOWERY: That was the testimony back in 1980, what it was worth.
“THE COURT: We have degrees and that is a matter for the Jury.
“MR. LOWERY: Are you regarding the statute of limitations to have run?
“THE COURT: No, sir, I’m just taking the evidence that has been heard here, and your argument as to the judgment of acquittal. Let’s proceed.
“(The jury was returned to the Jury Box, and the following proceedings occurred:)
“MR. LOWERY: The defendant rests.
“THE COURT: Any rebuttal?
“MR. FAMBROUGH: No.”
Almost immediately thereafter, the case was argued to the jury, and promptly thereafter the court gave the jury its oral charge.
It is our opinion that the crime charged in this case was not a continuing offense, as argued by counsel for defendant-appellant, and that it was barred by the statute of limitations of three years, which commenced to run in 1980; that whoever committed the crime charged by the indictment in the instant case did so more than three years before the prosecution was commenced; and that the trial judge should have granted defendant’s motion for dismissal of the case against him on that ground. We conclude that a reversal of the judgment of the trial court is proper. We are of the opinion that the case was barred by the statute of limitations and should have been dismissed on motion of defendant.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND RENDERED.
TYSON, TAYLOR, PATTERSON, McMILLAN, JJ., concur.
BOWEN, P.J., concurs in result only.